UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

FLB, LLC, FRANCINE BERGAMI, Individually
and as Administrator of the Estate of
Ronald Bergami,

|                | Plaintiffs | DECISION AND ORDER |

-vs-

06-CV-6463 CJS(P)

5LINX and CRAIG J. JERABECK,

|                | Defendants |

_____

APPEARANCES

| For plaintiffs: | Eddi Z. Zyko, Esq. |
| | 120 Fenn Road |
| | Middlebury, Connecticut 06762-2515 |
| | |
| | Jules L. Smith, Esq. |
| | Blitman & King |
| | The Powers Building, Suite 207 |
| | 16 West Main Street |
| | Rochester, New York 14614 |
| For defendant Craig J. Jerabeck: | Paul R. Braunsdorf, Esq. |
| | Harris Beach LLP |
| | 99 Garnsey Road |
| | Pittsford, New York 14534 |
| For defendant 5LINX: | Ellen J. Coyne, Esq. |
| | 31 East Main Street, Suite 2000 |
| | Rochester, New York 14614 |

INTRODUCTION

    This is a diversity action for breach of contract and related state-law torts, arising

from a franchise agreement between @Wireless Enterprises, Inc. ("@Wireless") and

FLB, LLC ("FLB"), involving the operation of a retail cellular telephone services shop in

1

Cromwell, Connecticut.  Now before the Court are the following motions: 1) Craig J.

Jerabeck's ("Jerabeck") motion for summary judgment [#49]; 2) Jerabeck's motion for

Rule 11 sanctions [#55]; 3) 5Linx's motion for summary judgment [#56]; and 4) Plaintiffs'

cross-motion to strike Jerabeck's affidavit [#63].  For the reasons that follow, Jerabeck's

and 5Linx's applications are granted, Plaintiffs' application is denied, and this action is

dismissed.

BACKGROUND

Unless otherwise stated, the following are the undisputed facts of this case,

viewed in the light most-favorable to Plaintiffs.  At all relevant times, Cellco Partnership

doing business as Verizon Wireless ("Verizon"), was a wireless communications service

provider, which sold cellular radio service and equipment through its own retail stores, as

well as through agents.  @Wireless was a seller of cellular communications services.  In

August 2000, Verizon and @Wireless entered into an "Authorized Agency Agreement"

("the Verizon Agreement") (Docket [#16-5]), in which Verizon appointed @Wireless as a

"non-exclusive sales agent" for Verizon's cellular radio service.  The agreement was for a

term of three years.  However, the agreement further provided that Verizon could

terminate the agreement, "*without cause*, upon six (6) months written notice to"

@Wireless. *Id*. at ¶ 9.1 (emphasis added).  Additionally, the agreement stated that

Verizon could "immediately terminate" the agreement upon written notice to @Wireless,

if @Wireless breached the agreement. *Id*. § 9.1.1.  Significantly, in that regard, the

agreement indicated that: 1) @Wireless could only sell Verizon's products within

specified geographic areas; 2) @Wireless could not sell the products of Verizon's

competitors; and 3) @Wireless could not sell Verizon's products over the internet.  *See*,

Fitzsimmons Affidavit [#59-9]  ¶ ¶ 4, 6-7.

The Verizon Agreement provided that @Wireless could delegate its obligations under the contract to "a subcontractor or sub-agent," by written contract, subject to the express written approval of Verizon.  The agreement further stated: "Personnel employed by, or acting under the authority of, Agent shall not be or be deemed to be employees or agents of Verizon Wireless, and Agent assumes full responsibility for their acts and shall have sole responsibility for their supervision and control." Agency Agreement § 2.  The Verizon Agreement included an addendum, entitled "Addendum Permitting Agent [@Wireless] to Distribute  Cellular Radio Service Through Sub-Agents." Pl. Memo of Law (05-CV-6176, Docket No. [#72-5], Ex. C).  Such addendum ("the Sub-agency Addendum") indicated that @Wireless could contract with sub-agents to sell Verizon's services, subject to Verizon's approval.  Verizon was designated as  "the beneficiary" of the addendum. *Id*. at ¶ 3(f). The addendum indicated that the Verizon Agreement would be attached to, and  incorporated by reference into, any agreement between @Wireless and its sub-agents.  However, the addendum further stated that @Wireless could "delete from [the copy of the Verizon Agreement provided to the subagent] all references to commissions, quotas, and related confidential information." *Id*. at ¶ 5.  Finally, the addendum stated: "Except to the extent set forth herein, Verizon Wireless shall not be considered a party to any contract or [illegible] between Agent [@Wireless] and sub-agent and shall assume no obligations or liabilities under any such contracts." *Id*.

Subsequently, on February 1, 2002, @Wireless entered into a franchise agreement with FLB ("the Franchise Agreement").  Specifically, @Wireless and FLB executed the subject Franchise Agreement, pursuant to which FLB obtained the right to

3

sell "cellular telephones, pagers and accessories and . . . cellular telephone services,

pager services and other related goods and services." Franchise Agreement ¶ 1.1.

Specifically, FLB agreed that it would sell @Wireless's "authorized products" and

services. *See, e.g., id.* at ¶ 8.1.3.  The agreement did not, however, indicate that FLB

was specifically obtaining the right to sell Verizon products.[1]  In fact, the  Franchise

Agreement does not mention Verizon or any other particular service provider, though a

financial statement attached to the agreement, dated December 31, 2000,  indicates that

@Wireless sold "wireless equipment and access to wireless service through a variety of

different carriers including Verizon Wireless, its major carrier." Financial Statement, Note

1.  The agreement also indicated that franchisees were considered independent

contractors, and that no fiduciary relationship existed between the parties. *Id*. at ¶ 16.1.

The Franchise Agreement was signed by Ronald Bergami[2] on behalf of FLB, and by

Michael Battaglia, @Wireless's Vice President of Franchise Development.  The

Franchise Agreement did not mention, and was not signed by, Jerabeck, who was

President of @Wireless at all relevant times.  Subsequently, FLB operated a retail outlet

as an @Wireless franchisee.  On a few occasions, during the course of the business

relationship between FLB and @Wireless, FLB dealt directly with Jerabeck,.  According

---

[1] @Wireless's franchise circular indicated that franchisees were purchasing the right to operate @Wireless retail stores, and to sell "cellular telephones, pagers and accessories and . . . cellular telephone services, pager services and other related goods and services."  The circular further stated: "Approved suppliers and specifications are determined based on the current needs for operating the franchised businesses.  We evaluate approved suppliers based on price, service, quality, and other commercially reasonable benchmarks.  The identity of approved suppliers and these specifications are updated periodically[.]"  The circular did not indicate that franchisees would be selling the products of any particular third-party supplier.  Specifically, the circular did not indicate that franchisees would be selling Verizon's products or services.

[2] Mr. Bergami was a Certified Public Accountant.

to Plaintiffs, Jerabeck told Ronald Bergami that he would "protect the interests" of FLB. However, it is unclear how Plaintiffs would know this, since Mr. Bergami is now deceased and Mrs. Bergami does not appear to have any personal knowledge on this point.

Unbeknownst to FLB, between 2002 and 2004, @Wireless breached its agreement with Verizon by, for example, selling products and services of Verizon's competitors. *See*, Affidavit of Timothy Fitzsimmons [#59-9] ¶ ¶ 10-21.  Defendant 5Linx, of which Jerabeck  was the President and sole shareholder, in addition to being President of @Wireless, and which was "affiliated" with @Wireless, also made unauthorized sales of Verizon's products on its website during this period.  Verizon complained to Jerabeck about the actions of both @Wireless and 5Linx, and Jerabeck admitted that @Wireless had breached its agreement with Verizon, and indicated that @Wireless and 5Linx would cease making unauthorized sales. *Id*.  However, both @Wireless and 5Linx continued to make unauthorized sales of Verizon's products. *Id*. Jerabeck did not inform FLB of the unauthorized sales by @Wireless and 5Linx, or of the resulting warnings from Verizon.  For example, Jerabeck did not inform FLB that, on July 30, 2004, Verizon sent Jerabeck a "cease and desist" letter, which stated, in pertinent part, that: 1) @Wireless has breaching the agreement with Verizon; 2) that @Wireless was required to immediately cease and desist from breaching the agreement; and 3) that "[s]hould [@Wireless] continue its current practice, Verizon Wireless will consider its options." FLB Memo of Law in Opposition to Summary Judgment, Exhibit I, New Jersey Complaint, Exhibit B. Instead, on or about September 10, 2004, Jerabeck sent an email to FLB, stating that @Wireless was in the process of negotiating a new contract with Verizon, which would not affect FLB's "day to day operations."  It is undisputed that

5

@Wireless was in fact attempting to negotiate such a contract with Verizon.

However, on or about September 16, 2004,  Verizon cut off service to @Wireless and its franchisees, including FLB.  Verizon purportedly terminated its agreement with @Wireless because of the aforementioned breaches of the Verizon Agreement by @Wireless, including the sale of competitors' products, and the sale of Verizon's products over the internet. (FLB Memo of Law in Opposition to Summary Judgment, Exhibit I, New Jersey Complaint, Exhibit C).  Verizon also simultaneously commenced an action against  @Wireless in United States District Court for the District of New Jersey. *Id*.  On or about September 21, 2004, @Wireless counter-sued Verizon in New York State Supreme Court, Monroe County.  @Wireless and Verizon subsequently settled the lawsuits and terminated their agreement.  In connection with the settlement, Verizon reinstated service to @Wireless's franchisees, including FLB, through November 24, 2004.  After that date, FLB and other franchisees were not able to sell Verizon products or services as subagents for @Wireless.  @Wireless offered franchisees monetary compensation for business that was lost during the period that Verizon service was cut off.  Additionally, @Wireless attempted to negotiate new agreements with service providers other than Verizon.[3]  On January 4, 2005, @Wireless stopped doing business.

On September 15, 2006, Plaintiffs commenced this action, against Jerabeck, 5Linx, @Wireless, and Verizon.  Plaintiffs later voluntarily discontinued the claims against Verizon and @Wireless[4], and all but one of the claims against 5Linx.

---

[3]*See*, related case 05-CV-6176, docket no. [#69-3].

[4]Apparently, Plaintiffs voluntarily discontinued their claims against @Wireless because of an arbitration provision in the Franchise Agreement.

Consequently, the claims remaining in this action are as follows: 1) constructive fraud against Jerabeck; 2) actual fraud against Jerabeck; 3) constructive trust against Jerabeck; 4) breach of contract against Jerabeck; 5) breach of implied covenant of good faith against Jerabeck; 6) tortious interference with contract against Jerabeck; 7) violation of New York General Business Law sections 349-350 against Jerabeck; 8) negligent misrepresentation against Jerabeck; and 9) tortious interference with contract against 5Linx.

On October 20, 2009, following a period of pretrial discovery, Jerabeck filed the subject motion for summary judgment [#49], and on November 16, 2009, he filed the subject motion for sanctions under Rule 11 [#55].   On November 20, 2009, 5Linx filed the subject motion for summary judgment [#56].  Plaintiffs filed opposing papers, and on December 18, 2009, filed the subject cross-motion [#63] to strike Jerabeck's affidavit, as a sanction for alleged spoliation of evidence.[5]  On July 29, 2010, counsel for the parties appeared before the undersigned for oral argument of the motions.

ANALYSIS

*Rule 56*

Summary  judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary

---

[5]Plaintiff's opposition papers in this action are identical to papers that he filed in a companion case, @Wireless Enterprises, Inc. v. AI Consulting, LLC, 05-CV-6176 CJS(P), in which Plaintiff sued Jerabeck and 5Linx, in a third-party action, raising claims identical to those asserted here.

judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322?23 (1986)), cert denied, 517 U.S. 1190 (1996). Once that burden has been established, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, it is well settled that the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)(citations omitted). Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) (citations omitted). Summary judgment is appropriate only where, "after drawing all reasonable

inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

*Plaintiffs' Motion to Strike Jerabeck's Affidavit*

At the outset, Plaintiffs contend that the Court should strike Jerabeck's affidavit submitted in support of summary judgment, as a sanction for spoliation of evidence.  In that regard, Jerabeck testified at his deposition that certain @Wireless corporate records were either lost or thrown away in or about 2007.  Specifically, Jerabeck testified that he "assumed" that certain documents were thrown away or misplaced, because he did not personally have possession of any documents, except certain documents of which copies had already been produced to Plaintiffs' attorney, and certain documents in the possession of Jerabeck's attorney.  Based on such testimony, Plaintiffs maintain that Jerabeck could not have personal knowledge about the matters set forth in his affidavit concerning @Wireless's corporate workings:

> [I]t is manifestly impossible for Jerabeck to make the statements that he does in his Affidavit in support of his and @Wireless's motions for summary judgment, particularly in Paragraph 9 thereof, and Paragraph 6 of his Statement of Material Facts Not in Dispute filed in support of his and @Wireless's motions for summary judgment.  As but one example thereof is the statement "Minutes were kept of all corporate meetings."

(Plaintiffs' Motion to Strike [#63] at 3).  In that regard, Jerabeck's statement of facts states, in pertinent part:

> The business of @Wireless was run totally separately and independently from any personal work or activities of Jerabeck.  This clear distinction between the business of @Wireless and the personal activities of Jerabeck is reflected by the following. (Jerabeck Aff., ¶ 9).  A. Corporate meetings were held on a regular basis during the years that @Wireless was actively engaged in business, and at all times relevant to this litigation.  B. Minutes

were kept of all corporate meetings.  C. Shareholders' assets were not used in conducting the business of @Wireless.  D. @Wireless maintained corporate records.  E. @Wireless maintained substantial assets and inventory for the conducting of its business.  F. @Wireless had bank accounts separate from Jerabeck and other corporate officers and was sufficiently capitalized such that it was able to conduct business from the time of its inception until is ceased active operations.  G. All of the business of @Wireless was conducted in its corporate name.  H. All payments for corporate obligations were made from the corporate checking account of @Wireless.  I. The business in which @Wireless was engaged was never conducted by Jerabeck in his personal capacity. J. All assets, of every kind used in the business, were titled in the name of @Wireless.  K. @Wireless did not use assets belonging to Jerabeck or any other shareholding in its daily operations. L. The corporate books of @Wireless were maintained separately from Jerabeck's personal records.  M. The financial records of @Wireless were audited every year by the Insero accounting firm in Rochester, New York.  N. Jerabeck never used the corporate funds of @Wireless for any personal purchases he made.

Jerabeck Stmt. of Facts [#50] ¶ 6.

In response to the motion to strike, Jerabeck submitted an affidavit [#70], in which he states that documents relating to this litigation were kept by @Wireless, but other documents were destroyed. *Id*. at ¶ 4.  Jerabeck further states that documents pertaining to this litigation were produced to Plaintiffs during discovery. *Id*.  Additionally, Jerabeck states that he prepared his earlier affidavit in support of summary judgment based on his own personal knowledge, and not on documents, as Plaintiffs suppose.  In that regard, Jerabeck states, in pertinent part: "I was the President and CEO of @Wireless and at one time was the sole owner. . . .  From holding that position, I know that corporate meetings were held on a regular basis.  I was a 'hands on' President and knew in great detail the day-to-day activities of @Wireless and the fact that a clear distinction existed between those activities and my activities as an individual[.]" *Id*.

The law concerning spoliation of evidence is as follows:

We have defined spoliation as the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.  The spoliation of evidence germane to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.  This sanction serves a threefold purpose of (1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation.  In borderline cases, an inference of spoliation, in combination with some (not insubstantial) evidence for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment.

Where one seeks an adverse inference regarding the content of destroyed evidence, one must first show that the party having control over the evidence  had an obligation to preserve it at the time it was destroyed.  Such an obligation usually arises when a party has notice that the evidence is relevant to litigation but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation.  The law in this circuit is not clear on what state of mind a party must have when destroying it. . . .  [A]t times we have required a party to have intentionally destroyed evidence; at other times we have required action in bad faith; and at still other times we have allowed an adverse inference based on gross negligence. In light of this, we concluded a case by case approach was appropriate.  Finally, a court must determine whether there is any likelihood that the destroyed evidence would have been of the nature alleged by the party affected by its destruction.  The burden falls on the prejudiced party to produce some evidence suggesting that a document or documents relevant to substantiating his claim would have been included among the destroyed files.

*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107-108 (2d Cir. 2001) (citations and internal quotation marks omitted).

In this case, Plaintiffs have not shown that Jerabeck is guilty of spoliation.  For example, Plaintiffs' motion alleges, in cursory fashion, only that unspecified @Wireless documents were thrown away.  Plaintiffs do not identify any particular documents that were destroyed.  Additionally, Plaintiffs do not maintain that they made a discovery

demand for any of the documents that were destroyed.  Plaintiffs do not explain how any discarded document would have helped their case.  Jerabeck states, and the deposition transcript indicates, that, at his deposition, he provided Plaintiffs' attorney with a large number of documents, which he had reviewed in preparing for the deposition.  Plaintiffs' attorney then asked Jerabeck generally about other @Wireless records, and Jerabeck stated that he had kept documents relating to FLB,  but he assumed that other documents were destroyed.  From this, Plaintiffs argue that Jerabeck could not have personal knowledge concerning the operations of @Wireless that are discussed in his affidavit.  However, the Court disagrees.  Having considered the factors discussed above, Plaintiffs' cross-motion to strike is denied.

*Claims Against Jerabeck In His Personal Capacity*

Jerabeck was the President of @Wireless and the President and sole shareholder of 5Linx.  Plaintiffs assert claims against Jerabeck personally, on the theory that he is the "alter ego" of both @Wireless and 5Linx. Complaint [#1] ¶ 9.  To the extent that Plaintiffs are seeking to hold Jerabeck personally liable for the acts of @Wireless and/or 5Linx, the Court must consider whether Plaintiffs may pierce the corporate veils of @Wireless and 5Linx.  The law concerning the alter-ego doctrine is well settled:

> Corporations, of course, are legal entities distinct from their managers and shareholders and have an independent legal existence. Ordinarily, their separate personalities cannot be disregarded.  In a broad sense, the courts do have the authority to look beyond the corporate form where necessary to prevent fraud or to achieve equity.  More specifically, where a shareholder uses a corporation for the transaction of the shareholder's personal business, as distinct from the corporate business, the courts have held the shareholder liable for acts of the corporation in accordance with the general principles of agency.  The determinative factor is whether 'the corporation is a 'dummy' for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal

12

rather than corporate ends.

*Port Chester Elec. Const. Co. v. Atlas*, 40 N.Y.2d 652, 656, 389 N.Y.S.2d 327, 331

(1976) (citations omitted); *Rivera v. Citgo Petroleum Corp.*,  181 A.D.2d 818, 819, 583

N.Y.S.2d 159 (2nd Dept. 1992) ("Generally, courts will only pierce the corporate veil and

hold two corporations to constitute a single legal unit, where one is so related to, or

organized, or controlled by, the other as to be its instrumentality or alter ego.")

 In support of his application for summary judgment on all claims, Jerabeck

maintains that it was clear that FLB was dealing with @Wireless, and not with him

personally.  In that regard, Jerabeck states, for example, the following facts: 1) Every

page of the Franchise Agreement between @Wireless and FLB contained a box for the

initials of FLB's representative, Mr. Bergami, and @Wireless's representative, Michael

Battaglia; 2) the Franchise Agreement did not refer to Jerabeck; 3) the Franchise

Agreement contained the statement, "[y]ou acknowledge that, in all of their dealings with

you, our officers, directors, employees and agents act only in a representative, and not in

an individual, capacity;" 4) emails sent to FLB by @Wireless were signed by Jerabeck as

"President and CEO of @Wireless."  Jerabeck Rule 56.1 Stmt.  Jerabeck also indicates,

in his affidavit, that @Wireless and 5Linx observed corporate formalities.

 In opposition to Jerabeck's motion, Plaintiffs state that FLB's President, Mr.

Bergami, met with Jerabeck while negotiating the franchise agreement, and believed

"that he was dealing with Jerabeck personally, and [that] Jerabeck was the business

opportunity with whom [FLB was] joining." Bergami Aff. ¶ 17.   Plaintiffs also state that

during one such meeting, Jerabeck did not mention that he was "talking to [Mr. Bergami]

as the President of @Wireless." *Id*.  Plaintiffs further indicate that Jerabeck traveled to

Connecticut on a few occasions to meet with franchisees.  Moreover, Plaintiffs refer to

deposition testimony by Jerabeck, in which he indicated that he personally lost one

million dollars as a result of the dispute between @Wireless and Verizon.

Such facts do not create a triable issue of fact as to whether Jerabeck was the

alter ego of @Wireless or 5Linx.  Even assuming, *arguendo*, that Plaintiffs' had firsthand

knowledge of what the deceased Mr. Bergami believed, a plaintiff's subjective belief that

he was dealing with a defendant in his personal capacity is insufficient to defeat

summary judgment, where the agreement indicates that defendant was acting as a

corporate representative, and where there is no evidence that defendant abused the

corporate form. *See, Colucci v. AFC Const.*, 54 A.D.3d 798, 798-99, 863 N.Y.S.2d 767,

768-69 (2d Dept. 2008):

> Catanzaro demonstrated that the construction contract at issue was solely
> between the plaintiffs as property owners and the defendant Southbayview
> Construction Corporation (hereinafter Southbayview), Catanzaro's
> closely-held corporation. The text of the contract expressly and
> unequivocally established that Catanzaro executed the agreement only as
> the representative of Southbayview, and the plaintiffs failed to present any
> evidence of an intention that Catanzaro was to be personally bound
> thereby.  In this regard, the plaintiff Steven Colucci's conclusory assertions
> in opposition to the motion for summary judgment that he was unaware that
> any corporation was involved in the transaction and believed that
> Catanzaro was conducting business as an individual are completely
> contradicted by the language of the contract. . . .
>
> The plaintiffs similarly failed to raise an issue of fact as to whether
> Catanzaro abused the corporate form in order to commit a wrong which
> injured them, so as to warrant the piercing of Southbayview's corporate veil
> in order to hold him personally liable.

Plaintiffs have not raised a triable issue of fact as to Jerabeck's personal liability, under

the alter ego theory.

As to any contractual claims against Jerabeck, the Court having rejected Plaintiffs'

alter ego theory, finds that he is entitled to summary judgment.  He was not a party to any contract involved in this action in his individual capacity, and therefore, he cannot be liable on the claims for breach of contract or breach of implied covenant of good faith.

As to various tort claims against Jerabeck, apart from their alter ego theory, Plaintiffs contend that Jerabeck is personally liable even though he committed the acts at issue in his capacity as a corporate officer.  In that regard, in New York, "[a] corporate officer who participates in the commission of a tort, regardless of whether he acts on behalf of the corporation and in the course of his corporate duties, may ordinarily be held individually responsible." *LaLumia v. Schwartz*, 23 A.D.2d 668, 669, 257 N.Y.S.2d 348, 350 (2d Dept. 1965); *see also, Bailey v. Baker's Air Force Gas Corp.*, 50 A.D.2d 129, 133, 376 N.Y.S.2d 212, 216 (3d Dept. 1975) ("Corporate officers are liable for their torts although they committed them when acting officially.").  Therefore, the Court will now consider whether Jerabeck is entitled to summary judgment on the various tort claims, as well as whether 5Linx is entitled to summary judgment.

*Actual Fraud and Constructive Fraud Claims Against Jerabeck*

First the Court turns its attention to Plaintiffs' claims for actual fraud and constructive fraud.   In that regard, Plaintiffs contend that Jerabeck fraudulently induced FLB to enter into the Franchise Agreement with @Wireless, by misleading FLB about the problems that @Wireless was having with Verizon, and by telling FLB that he would protect FLB's interests.

To prevail on a cause of action for actual fraud, a plaintiff must establish that a defendant made "a representation of fact, which is either untrue and known to be untrue or recklessly made, and which was offered to deceive the other party and to induce him

15

to act upon it, causing injury." *Klembczyk v. Di Nardo*, 265 A.D.2d 934, 936, 705 N.Y.S.2d 743, 744 (4th Dept. 1999) (citation and internal quotation marks omitted).  The elements of constructive fraud are the same as those for actual fraud, except that the element of scienter is replaced by a fiduciary or confidential relationship between the parties. *Id*., 265 A.D.2d at 936, 705 N.Y.S.2d at 744.  Such a relationship requires a "high degree of dominance and reliance," and where the parties have an arm's length business relationship, a plaintiff's "subjective claims of reliance on defendants' expertise" are insufficient. *SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d 352, 355, 777 N.Y.S.2d 62, 65 (1st Dept. 2004) (citations omitted).  Rule 9(b) of the Federal Rules of Civil Procedure requires that averments of fraud be "stated with particularity," which means that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).

To the extent that Plaintiffs are alleging that Jerabeck fraudulently induced FLB to enter into the Franchise Agreement, Jerabeck is entitled to summary judgment, because the alleged misrepresentations and omissions concerning Verizon did not occur until after the agreement was formed.[6]  However, Plaintiffs also appear to allege that in 2004, Jerabeck fraudulently concealed the problems that @Wireless was having with Verizon, and that Jerabeck had a fiduciary duty to disclose that information.  In that regard,

[t]he elements of a fraudulent misrepresentation claim consist of a

---

[6]Additionally, it does not appear that Plaintiffs have any firsthand knowledge about any alleged verbal misrepresentations by Jerabeck.

> misrepresentation or a material omission of fact which was known to be
> false by defendant, made for the purpose of inducing the other party to rely
> upon it, justifiable reliance of the other party and injury.  A claim for
> fraudulent concealment requires additionally setting forth that the defendant
> had a duty to disclose material information. Such a duty arises where a
> fiduciary or confidential relationship exists between the parties.

*Mandarin Trading Ltd. v. Wildenstein*, 65 A.D.3d 448, 884 N.Y.S.2d 47, 57 (1st Dept.

2009) (citations and internal quotation marks omitted).  It appears well settled that

generally, "[t]]here is no fiduciary relationship between a franchisee and a franchisor."

*Akkaya v. Prime Time Transp., Inc.*, 45 A.D.3d 616, 845 N.Y.S.2d 827, 828 (2d Dept.

2007) (citations omitted); *see also, Wilmington Trust Co. v. Burger King Corp.*, 34 A.D.3d

401, 826 N.Y.S.2d 205, 206 (1st Dept. 2006) ("[B]ecause the relationship between the

franchisor and franchisees was not a fiduciary one, the franchisor had no affirmative duty

to disclose that the consultant was acting on its behalf rather than the franchisees" ).

Here, there is no indication that FLB and @Wireless had anything other than an

arm's-length franchisor-franchisee business relationship.  Nor is there any evidence that

Jerabeck and FLB had a fiduciary relationship.  Consequently, the Court finds that

Jerabeck is entitled to summary judgment on the fraud and constructive fraud claims.

*Constructive Trust Claim Against Jerabeck*

The Court will now consider Plaintiffs' constructive trust claim.  It is well settled

that four elements are required for a constructive trust: "(1) a confidential or fiduciary

relationship; (2) a promise, express or implied; (3) a transfer of the subject *res* made in

reliance on that promise; and (4) unjust enrichment." *In re First Central Fin. Corp.*, 377

F.3d 209, 212 (2d Cir. 2004) (citations omitted).  As already discussed, in general there

is no fiduciary relationship between a franchisor and franchisee. *See, Marcella & Co.,*

17

*Inc. v. Avon Prods., Inc.*, 282 A.D.2d 718, 719, 724 N.Y.S.2d 192, 193 (2nd Dept. 2001)

("[T]here is no fiduciary relationship between a franchisee and a franchisor.") (citation

omitted).  Plaintiffs have not raised a triable issue of fact on this point.   Consequently,

Jerabeck is entitled to summary judgment on the constructive trust claim.

   *Claim for Violation of NY General Business Law (GBL) § § 349-350*

   Plaintiffs next contends that Jerabeck violated New York's statutory prohibition

against deceptive business practices and advertising.  GBL § 349 prohibits deceptive

business practices, while GBL § 350 prohibits "[f]alse advertising in the conduct of any

business, trade or commerce or in the furnishing of any service."  Significantly, claims

under GBL § § 349 and 350 must involve conduct that was directed at the public at large.

*Canario v. Gunn*, 300 A.D.2d 332, 333, 751 N.Y.S.2d 310, 311 (2d Dept. 2002).

Consequently, claims arising from private disputes are not actionable.  *New York Univ. v.*

*Continental Ins. Co.*, 87 N.Y.2d 308, 320, 639 N.Y.S.2d 283, 290 (1995) ("The conduct

need not be repetitive or recurring but defendant's acts or practices must have a broad

impact on consumers at large; private contract disputes unique to the parties  would not

fall within the ambit of the statute") (emphasis added, citation omitted);  *Wilner v. Allstate*

*Ins. Co.*, 71 A.D.3d 155, 893 N.Y.S.2d 208, 215 (2d Dept. 2010) ("In connection with the

character of General Business Law § 349 as a broad consumer protection statute and

the requirements that the complained of conduct have a broad impact on consumers at

large, the statute does not apply to private contract disputes unique to the parties.")

(citations and internal quotation marks omitted).   The instant action involves a private

contract dispute, therefore Jerabeck is entitled to summary judgment on the GBL claims.

*Negligent Misrepresentation Claim Against Jerabeck*

Next the Court considers Plaintiffs' claim against Jerabeck for negligent

misrepresentation.  The elements of such a claim are that

> (1) the defendant had a duty, as a result of a special relationship, to give
> correct information; (2) the defendant made a false representation that he
> or she should have known was incorrect; (3) the information supplied in the
> representation was known by the defendant to be desired by the plaintiff for
> a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5)
> the plaintiff reasonably relied on it to his or her detriment.  However, the
> alleged misrepresentation must be factual in nature and not promissory or
> relating to future events that might never come to fruition.

*Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20-21 (2nd Cir. 2000) (citations

omitted).  As to the first of these elements, in order to determine the existence of a

special relationship and duty in the context of a negligent misrepresentation claim, the

Second Circuit has held that New York law requires a fact finder to consider the following

three factors: "whether the person making the representation held or appeared to hold

unique or special expertise; whether a special relationship of trust or confidence existed

between the parties; and whether the speaker was aware of the use to which the

information would be put and supplied it for that purpose." *Suez Equity Investors, L.P. v.*

*Toronto-Dominion Bank*, 250 F.3d 87, 103 (2d Cir.2001) (quotation marks and citation

omitted).  In *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (1996), the New York Court of

Appeals explained that "[i]n the commercial context, a duty to speak with care exists

when the relationship of the parties, arising out of contract or otherwise, [is] such that in

morals and good conscience the one has the right to rely upon the other for information."

(quotation marks and citation omitted).  In general, though, a simple commercial

relationship, such as that between a buyer and seller or franchisor and franchisee, does

not constitute the kind of "special relationship" necessary to support a negligent misrepresentation claim. *See Dimon, Inc. v. Folium, Inc.*, 48 F.Supp.2d 359, 373 (S.D.N.Y.1999) ("[A]n arm's length business relationship is not enough.") (citation omitted); *see also, Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 215 (S.D.N.Y. 2007) ("A simple commercial relationship, such as that between a franchisor and franchisee, does not constitute the kind of special relationship necessary for a negligent misrepresentation claim.") (citations omitted).

In this case, as already discussed, Plaintiffs have not produced evidentiary proof in admissible form that there was a special relationship of trust between FLB and Jerabeck. Instead, the record indicates that the parties had an arm's-length business relationship.  Consequently, Jerabeck is entitled to summary judgment on the negligent misrepresentation counterclaim.

*Tortious Interference with Contract Claims Against Jerabeck and 5Linx*

Plaintiffs' only remaining claims are the tortious interference with contract claims against Jerabeck and 5Linx.  "[T]he tort of intentional interference with the performance of a contract requires proof of the following elements: a valid contract between plaintiff and a third party; defendant's knowledge of the contract; defendant's intentional procurement of a breach by the third party; and resultant damages." *Chu v. Dunkin' Donuts Inc.*, 27 F.Supp.2d 171, 173 (E.D.N.Y. 1998) (citations omitted).  A defendant intentionally procures a breach when he "knows of a valid . . . contract" and "commits an intentional act whose probable and foreseeable outcome is that one party will breach the contract, causing the other party damage." *Leventhal v. Franzus Co., Inc.*, No. 88 CIV.

20

3547 (MBM), 1988 WL 132868 at *7 (S.D.N.Y. Dec. 6, 1988).

In this action, the Complaint [#1] is unclear concerning the contract that was the subject of the tortious interference.  The Complaint states, in pertinent part:  "The actions of Jerabeck, as complained of in this complaint, amount to intentional interference with the aforesaid business or contractual relationships of FLB, Ron [Bergami] and Fran [Bergami]." Complaint ¶ 40.  Moreover, the Complaint alleges that the Verizon Agreement, between Verizon and @Wireless, and the Franchise Agreement, between @Wireless and FLB, were "interlocking agreements." *See, e.g.*, Complaint ¶ ¶ 21-22, 33-34, 38.  In that regard, paragraph 33, for example, states that "Jerabeck caused the breach in the provisions of the interlocking contracts existing between FLB, Ron and Fran on the one hand and @Wireless and [Verizon] on the other." *Id*. at ¶ 33.  However, in their papers submitted in opposition to the summary judgment motions, Plaintiffs expressly contend that they are parties to the Verizon Agreement, which they identify as the contract that was breached. *See*, Pl. Stmt. of Facts [#78] at p. 9 ("Therefore, according to its very terms, AI, et al, and FLB, are parties to said Contract No. 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."); *see also, id*. a p. 11, ¶ numbered 3 ("FLB et al., are parties to said Contract No. 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.").

To the extent that Plaintiffs are relying on the alleged breach of the Verizon Agreement, they cannot prevail on their tortious interference claims, since, as the Court has already held, @Wireless's franchisees, including FLB, were neither parties to, nor third-party beneficiaries of, that contract. *See, related case, @Wireless Enterprises, Inc. v. AI Consulting, LLC, et al.*, 6:05-CV-06176-CJS-MWP, Decision and Order [#33] at p.

10.

Consequently, Plaintiffs may only avoid having summary judgment entered against them on their tortious interference claims if they can produce evidence that Jerabeck and/or 5Linx caused a breach of *the Franchise Agreement*.  However, on this point, it does not seem that Plaintiffs are even maintaining that such Franchise Agreement was breached.  Instead, as already discussed, Plaintiffs devote a great deal of energy, and the vast majority of the space in their papers, to arguing that they are parties to the Verizon Agreement, presumably because they have, in their view, evidence that the Verizon Agreement was breached, based upon the affidavits and deposition of Verizon employees Timothy Fitzsimmons [#59-9] and Mario Turco [#59-10].  For example, in their Memorandum of Law [#66] submitted in opposition to 5Linx's motion, Plaintiffs explain that their tortious interference claim is based on the alleged breach of the Verizon Agreement. *See, id*. at 4-8; see also, Pl. Memo of Law [#59] at 17 ("If AI, et al, and FLB, et al, were informed of Jerabeck's egregious conduct that *cause Verizon to terminates [sic] said business relationship with @Wireless and, hence, themselves*, [they] could and would have taken timely measures[.]") (emphasis added).  In short, the only contract in this action to which FLB was a party was the Franchise Agreement, and Plaintiffs have not shown, or even specifically claimed, that it was breached.  Such fact is highly significant, since the movants specifically argued that FLB could not establish a breach of the Franchise Agreement. *See, e.g.*, 5Linx Memo of Law [#56] at 10 ("@Wireless was able to perform under its agreement with FLB LLC, had timely cured the termination of services by Verizon by offering new carriers and the FLB LLC

22

franchise agreement did not expressly state [that] @Wireless is to provide any specific carrier to it, including Verizon.").  Nor does it appear that Plaintiffs could establish such a breach, since, as discussed above, the Franchise Agreement was not dependent on FLB's ability to sell Verizon products or services.  Instead, as mentioned earlier, FLB was aware that Verizon always had the right to terminate its agreement with @Wireless without cause.  In such case, the Franchise Agreement would have continued to exist, notwithstanding the termination of the Verizon-@Wireless relationship, and FLB and the other franchisees would have retained the right to sell other products and services as authorized by @Wireless.  In any event, Plaintiffs have not produced evidentiary proof in admissible form that the terms of the Franchise Agreement were breached. Consequently, Jerabeck and 5Linx are entitled to summary judgment on the tortious interference with contract claims.

*Jerabeck's Application for Rule 11 Sanctions*

Jerabeck contends that he is entitled to sanctions against Plaintiffs' attorney, because the alter ego claims against him were "frivolous and utterly unsupported by any facts." Jerabeck Memo of Law [#55-3] at 2.  Jerabeck states that during his deposition, Plaintiffs' counsel did not ask questions relevant to piercing the corporate veil.  Jerabeck further state's that Iorio's own deposition indicated that he had no basis to pierce the corporate veil and assert claims directly against Jerabeck.  Consequently, Jerabeck contends that Plaintiffs' attorney violated Rule 11(b) by pursuing a claim with no evidentiary support.  In response, Plaintiffs' counsel submitted a two-page memo of law, maintaining that Jerabeck's application is deficient, because it does not describe the specific conduct alleged to have violated Rule 11 or the specific sanction being sought.

Memo of Law [#68] at 2.  Plaintiffs' counsel also contends that the "case" against

Jerabeck is meritorious, without specifically claiming that the alter ego claim is

meritorious. *Id*.

The law in this circuit concerning Rule 11 violations is clear:

Fed.R.Civ.P. 11, which confers on a district court authority to sanction a litigant or its counsel, provides in relevant part:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,-
>
> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; [and]
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law[.]

Fed.R.Civ.P. 11(b). The 1993 Advisory Committee Note explains that Rule 11(b)(2) "establishes an objective standard, intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments." Fed.R.Civ.P. 11 advisory committee note to 1993 amendments. In addition, "the extent to which a litigant has researched the issues and found some support for its theories even in minority opinions, in law review articles, or through consultation with other attorneys should certainly be taken into account in determining whether paragraph (2) has been violated." *Id*. "Although arguments for a change of law are not required to be specifically so identified, a contention that is so identified should be viewed with greater tolerance under the rule." *Id*.

Once a court determines that Rule 11(b) has been violated, it may in its discretion impose sanctions limited to what is "sufficient to deter repetition of such conduct." Fed.R.Civ.P. 11(c)(2); see also Fed.R.Civ.P. 11 advisory committee note to 1993 amendments. The court may impose, among other things, monetary sanctions. See Fed.R.Civ.P. 11(c)(2). Monetary sanctions, however, "may not be awarded against a represented party for a violation of subdivision (b)(2)," Fed.R.Civ.P. 11(c)(2)(A), because "[m]onetary

> responsibility for such violations is more properly placed solely on the party's attorneys," Fed.R.Civ.P. 11 advisory committee note to 1993 amendments.

*Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 166 (2d Cir. 1999).

Applying the foregoing objective standard, the Court finds that Plaintiffs' claims against Jerabeck, under the alter ego/veil piercing theory, were not warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.  In that regard, Plaintiffs have not produced any evidence to support an alter ego/veil piercing theory.  Having found a violation of Rule 11(b), the Court must consider, in its discretion, whether to impose a sanction, with any such sanction being limited to what is sufficient to deter repetition of such conduct.  Sanctions may include "(a) directives of a nonmonetary nature, such as striking the offending paper, issuing an admonition, reprimand, or censure, or, requiring participation in seminars or other educational programs; (b) an order to pay a penalty into court; or (c) referring the matter to disciplinary authorities." *Boyce-Idlett v. Verizon Corporate Services Corp.*, No. 06 Civ. 975(DAB)(KNF), 2007 WL 3355497 at *2 (S.D.N.Y. Nov. 6, 2007) (citations omitted).  Jerabeck has not requested any particular sanction.

Having considered the matter, the Court believes that an admonition is sufficient to deter future conduct.  Consequently, Plaintiffs' counsel is hereby advised that his conduct in pursuing a claim without an objectively proper factual or legal basis violated Rule 11(b), and he is admonished and directed to avoid such conduct in the future.

CONCLUSION

Plaintiffs' motion [#63] to strike Jerabeck's affidavit is denied.  Jerabeck's

summary judgment motion [#49] and his Rule 11 motion [#55] are granted.  5Linx's

summary judgment motion [#56] is granted.  The Clerk of the Court is directed to enter

judgment for Jerabeck and 5Linx and to terminate this action.

      SO ORDERED.

Dated:      Rochester, New York
            May 13, 2011

                              ENTER:


                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge